IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RECEIPT # 52859
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 1-6-04

ALBERT FELDMAN, on behalf of Himself and
All Others Similarly Situated,

             Plaintiff,

v.

MASSACHUSETTS FINANCIAL SERVICES
COMPANY, MFS INVESTMENT
MANAGEMENT, SUN LIFE FINANCIAL,
INC., MFS SERIES TRUST I, MFS SERIES
TRUST II, MFS SERIES TRUST III, MFS
SERIES TRUST IV, MFS SERIES TRUST V,
MFS SERIES TRUST VI, MFS SERIES
TRUST VII, MFS SERIES TRUST VIII, MFS
SERIES TRUST IX, MFS SERIES TRUST X,
MFS SERIES TRUST XI, MFS CAPITAL
OPPORTUNITIES FUND, MFS CORE
GROWTH FUND, MFS EMERGING
GROWTH FUND, MFS LARGE CAP
GROWTH FUND, MFS MANAGED
SECTORS FUND, MFS MID CAP GROWTH
FUND, MFS NEW DISCOVERY FUND, MFS
NEW ENDEAVOR FUND, MFS RESEARCH
FUND, MFS STRATEGIC GROWTH FUND,
MFS TECHNOLOGY FUND,
MASSACHUSETTS INVESTORS GROWTH
STOCK, MFS MID CAP VALUE FUND, MFS
RESEARCH GROWTH AND INCOME
FUND, MFS TOTAL RETURN FUND, MFS
UNION STANDARD EQUITY FUND, MFS
UTILITIES FUND, MFS VALUE FUND,
MASSACHUSETTS INVESTORS TRUST,
MFS AGGRESSIVE GROWTH
ALLOCATION FUND, MFS
CONSERVATIVE ALLOCATION FUND,
MFS CONSERVATIVE ALLOCATION
FUND, MFS MODERATE ALLOCATION
FUND, MFS BOND FUND, MFS EMERGING
MARKETS DEBT FUND, MFS
GOVERNMENT LIMITED MATURITY
FUND, MFS GOVERNMENT MORTGAGE
FUND, MFS GOVERNMENT SECURITIES

Civil Action No.

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

04 CV 10009 RGS

MAGISTRATE JUDGE _____

FUND, MFS HIGH INCOME FUND, MFS : 
HIGH YIELD OPPORTUNITIES FUND, MFS :
INTERMEDIATE INVESTMENT GRADE :
BOND FUND, MFS LIMITED MATURITY :
FUND, MFS RESEARCH BOND FUND, :
MFS STRATEGIC INCOME FUND, MFS :
ALABAMA MUNICIPAL BOND FUND, :
MFS ARKANSAS MUNICIPAL BOND FUND, :
MFS CALIFORNIA MUNICIPAL BOND :
FUND, MFS FLORIDA MUNICIPAL BOND :
FUND, MFS GEORGIA MUNICIPAL BOND :
FUND, MFS MARYLAND MUNICIPAL :
BOND FUND, MFS MASSACHUSETTS :
MUNICIPAL BOND FUND, MFS :
MISSISSIPPI MUNICIPAL BOND FUND, :
MFS MUNICIPAL BOND FUND, MFS :
MUNICIPAL LIMITED MATURITY FUND, :
MFS NEW YORK MUNICIPAL BOND FUND, :
MFS NORTH CAROLINA MUNICIPAL :
BOND FUND, MFS PENNSYLVANIA :
MUNICIPAL BOND FUND, MFS SOUTH :
CAROLINA MUNICIPAL BOND FUND, MFS :
TENNESSEE MUNICIPAL BOND FUND, :
MFS VIRGINIA MUNICIPAL BOND FUND, :
MFS WEST VIRGINIA MUNICIPAL BOND :
FUND, MFS EMERGING MARKETS :
EQUITY FUND, MFS GLOBAL EQUITY :
FUND, MFS GLOBAL GROWTH FUND, MFS :
GLOBAL TOTAL RETURN FUND, MFS :
INTERNATIONAL GROWTH FUND, MFS :
INTERNATIONAL NEW DISCOVERY FUND, :
MFS INTERNATIONAL VALUE FUND, MFS :
RESEARCH INTERNATIONAL FUND, :
(collectively the "MFS Funds"), and :
JOHN DOE CORPORATIONS 1-100, :
:
              Defendants. :
:
:

## CLASS ACTION COMPLAINT

Plaintiff alleges the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings as well as other regulatory filings and reports and advisories about the MFS Family of

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa); Section 22 of the Securities Act (15 U.S.C. § 77v); Section 80-b 14 of the Investment Advisers Act (15 U.S.C. § 80b-14); and 28 U.S.C. §§ 1331, 1337.

4. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.

5. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff Albert Feldman, as set forth in his certification, which is attached hereto and incorporated by reference herein, purchased units of the MFS Funds during the Class Period and has been damaged thereby.

7. Each of the mutual funds in the MFS family of mutual funds (collectively, the "MFS Funds") is a mutual fund that is regulated by the Investment Advisers Act of 1940 and that buys, holds, and sells shares or other ownership units that are subject to the misconduct alleged in this complaint. The MFS Funds are managed by MFS Investment Management, as defined below.

8. Defendant Sun Life Financial, Inc. ("Sun Life") is the ultimate parent of all of the MFS defendants. Sun Life is an internationally diversified financial services organization providing savings, retirement and pension products, as well as life and health insurance to individuals and groups through its operations in Canada, the United States, the United Kingdom and Asia.

9. Defendant Massachusetts Financial Services Company ("MFSC") is registered as an investment adviser under the Investment Advisers Act and, together with Defendant MFS Investment Management, managed and advised the MFS Funds during the Class Period. Massachusetts Financial Services Company maintains its principal place of business at 500 Boylston Street, Boston, MA 02116.

10. Defendant MFS Investment Management is registered as an investment adviser under the Investment Advisers Act and, together with Defendant MFSC, managed and advised the MFS Funds during the Class Period. MFS Investment Management maintains its principal place of business at 500 Boylston Street, Boston, MA, 02116.

11. Defendants MFSC and MFS Investment Management are hereinafter referred to collectively as "MFS Investment Management."

12. Defendant MFS Series Trust I, II, III, IV, V, VI, VII, VIII, IX, X, and XI (collectively referred to as the "Fund Registrants") are the registrants of the MFS Funds. The Fund Registrants maintain their principal place of business at 500 Boylston Street, Boston, MA, 02116.

13. Sun Life, MFS, the MFS Funds, and the Fund Registrants are referred to collectively herein as the "Fund Defendants."

14. The true names and capacities of defendants sued herein as John Does 1 through 100 are other active participants with the Fund Defendants in the widespread

5

unlawful conduct alleged herein whose identities have yet to be ascertained. Such defendants were secretly permitted to engage in improper timing at the expense of ordinary MFS Funds investors, such as plaintiffs and the other members of the Class, in exchange for which the John Doe defendants provided remuneration to the Fund Defendants. Plaintiffs will seek to amend this complaint to state the true name and capacities of said defendants when they have been ascertained.

## SUBSTANTIVE ALLEGATIONS

### Background: Timed Trading and Its Effect on Long-Term Investors

15. Mutual funds, including the MFS Funds, are meant to be long-term investments and are therefore the favored savings vehicles for many Americans' retirement and college funds.

16. "Timing" is an arbitrage strategy involving short-term trading that can be used to profit from mutual funds' use of "stale" prices to calculate the value of securities held in the funds' portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese securities. Because of the time zone difference, the Japanese market may close at *2 a.m.* New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese securities in his or her fund to arrive at an NAV at *4 p.m.* in New York, he or she is relying on market information that is fourteen hours old. If there has been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV would not reflect the true current market value of the stocks the fund holds. This and similar strategies are known as "time zone arbitrage."

6

17. A similar type of timing is possible in mutual funds that contain illiquid securities such as high-yield bonds or small capitalization stocks. Here, the fact that some of the MFS Funds' underlying securities may not have traded for hours before the New York closing time can render the fund's NAV stale and thus open it to being timed. This is sometimes known as "liquidity arbitrage."

18. Effective timing captures an arbitrage profit that comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

19. Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Trades necessitated by timer redemptions can also result in the realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.

20. It is widely acknowledged that timing inures to the detriment of long-term mutual fund shareholders and, because of this detrimental effect, most mutual funds prohibit the practice. Plaintiff and each of the Class members purchased shares or other ownership units in Putnam Funds pursuant to a registration statement and prospectus. The registration statements and prospectuses pursuant to which plaintiffs and the other Class members purchased their shares or other ownership units in the Putnam Funds are referred to collectively herein as the "Prospectuses." The Prospectuses in the instant case stated that timing is monitored and that the Fund Defendants work to prevent it. As will be set forth

7

below, these statements were materially false and misleading because, not only did the Fund Defendants allow the John Doe Defendants to time their trades, but they actively facilitated the timing arbitrage strategy and sought to profit and did profit from it.

### Defendants' Fraudulent Scheme: Secret Timed Trading in Exchange for Fees and Other Remuneration

21. Unbeknownst to investors, from at least as early as December 15, 1998 and until December 8, 2003, inclusive, defendants engaged in fraudulent and wrongful schemes that enabled certain favored investors like the John Doe Defendants to reap many millions of dollars in profits at the expense of the MFS Funds' plaintiffs and other members of the Class, through improper, secret timed trading.

22. In exchange for allowing and facilitating this improper conduct, the Fund Defendants received substantial fees and other remuneration for themselves and their affiliates to the detriment of plaintiffs and other members of the Class who knew nothing of these illicit arrangements. Specifically, MFS Investment Management, as manager of the MFS Funds, and each of the relevant fund managers, profited from fees MFS Investment Management charged to the MFS Funds that were measured as a percentage of the fees under management.

23. In exchange for the right to engage in timing, which hurt plaintiffs and other Class members by artificially and materially affecting the value of the MFS Funds, the John Doe Defendants agreed to park substantial assets (sometimes referred to as "sticky assets" or "static assets") in the Funds, thereby increasing the assets under MFS Funds' management and the fees paid to MFS Funds' managers.

24. Furthermore, the John Doe Defendants secretly disguised additional, improper compensation to the Fund Defendants as interest payments on monies loaned by the Fund Defendants to the John Doe Defendants for the purpose of financing the illegal scheme.

25. The synergy between the Fund Defendants and the John Doe Defendants hinged on ordinary investors' misplaced trust in the integrity of mutual fund companies and allowed defendants to profit handsomely at the expense of plaintiffs and other members of the Class.

## The Prospectuses Were Materially False and Misleading

26. Prior to investing in any of the MFS Funds, plaintiff and each member of the Class were entitled to and did receive one of the Prospectuses, each of which contained substantially the same materially false and misleading statements regarding the MFS Funds' policies on timed trading.

27. The Prospectuses falsely stated that MFS Investment Management actively safeguarded shareholders from the harmful effects of timing. The Prospectuses stated (emphasis added):

> "**MFS Funds do not permit market timing or other excessive trading practices.** Excessive, short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance. **MFS Funds will reject or restrict an investor's purchase orders if there is a history of market timing.** . . .Requests to exchange shares of MFS global and international funds that have not been held for 15 days will be refused.

28. The Prospectuses failed to disclose and misrepresented the following material and adverse facts;

    a. that defendants had entered into agreements allowing the John Doe defendants to time their trading of the MFS Funds shares;

9

b. that, pursuant to those agreements, the John Doe Defendants regularly timed their trading in the MFS Funds shares;

c. that, contrary to the express representations in the Prospectuses, the MFS Funds enforced their policy against frequent traders selectively, i.e., they did not enforce it against the John Doe Defendants and waived the redemption fees, at MFS Funds' investors expense, that the John Doe Defendants should have been required to pay, pursuant to MFS Funds' stated policies;

d. that the Fund Defendants regularly allowed the John Doe Defendants to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs and thereby reduced the MFS Funds' actual performance; and

e. the Prospectuses falsely represented the amount of compensation paid by the MFS Funds to MFS Investment Management because of the MFS Funds' secret agreement with the John Doe Defendants provided additional undisclosed compensation to MFS Investment Management by the MFS Funds and their respective shareholders.

### THE SCHEME IS REVEALED

29. On September 3, 2003, New York Attorney General Eliot Spitzer filed a complaint in New York Supreme Court that exposed the fraudulent and manipulative practices alleged herein (the "Spitzer Complaint"), charging the several mutual fund families and hedge funds with fraud in connection with the unlawful practices alleged herein and exposing the fraudulent and manipulative practices of the defendants with the particularity that had resulted from a full- scale confidential investigation.

30. On September 4, 2003 *The Wall Street Journal* reported that the fraudulent practices enumerated in the Spitzer Complaint were just the tip of the iceberg, stating as follows:

> In a statement, Mr. Spitzer said "the full extent of this complicated fraud is not yet known," but he asserted that "the mutual-fund industry operates on a double standard" in which certain traders "have been

given the opportunity to manipulate the system. They make illegal after-hours trades and improperly exploit market swings in ways that harm ordinary long-term investors."

31.   On December 8, 2003, Sun Life disclosed that staff members at the SEC had recommended that an enforcement action be brought against MFS for allegedly false and misleading prospectus statements about market timing and for breach of fiduciary duty. According to an article appearing on December 9, 2003 in *The New York Times*, the SEC was recommending this action because MFS "allowed privileged clients to trade quickly in and out of its biggest funds while saying it restricted the practice for the vast majority of its shareholders."

32.   *The New York Times* article went on to state that, according to a memorandum from a senior company executive at MFS:

> [E]xecutives at MFS essentially created two classes of funds – a small group of large funds that would accept rapid-fire trades, a practice known as market timing, and a larger group of international funds that would not. **At no time, though, did MFS change the language in its prospectuses, which said that market timing was not permitted in any of its funds.**

(emphasis added). In addition, the memorandum directed brokers selling MFS Funds to accept short-term trades for five of the funds "even if a pattern of excessive trading has been detected."

33.   On December 12, 2003, MFS acknowledged in a regulatory filing that the office of New York State Attorney General Eliot Spitzer might also bring an enforcement action against MFS for market timing in the MFS Funds.

34.   Each defendant is liable for (i) making false statements, or for failing to disclose adverse facts while selling shares of the MFS Funds, and/or (ii) participating in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers

11

of the MFS Funds shares during the Class Period (the "Wrongful Conduct"). This Wrongful Conduct enabled defendants to profit at the expense of plaintiffs and other Class members.

## ADDITIONAL SCIENTER ALLEGATIONS

35. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the MFS Funds were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding MFS Funds, their control over, and/or receipt and/or modification of MFS Funds' allegedly materially misleading misstatements and/or their associations with the MFS Funds which made them privy to confidential proprietary information concerning the MFS Funds, participated in the fraudulent scheme alleged herein.

36. Additionally, the Fund Defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, the Fund Defendants, among other things, received increased management fees. The John Doe Defendants were motivated to participate in the wrongful scheme by the enormous profits they derived thereby. They systematically pursued the scheme with full knowledge of its consequences to other investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

37. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who